## [No. 2950.]

## MEEK FONDREN v. THE STATE.

AGGRAVATED ASSAULT—INTENT—EVIDENCE.—In every assault there must
be an intent to injure coupled with an act which must at least be the be-
ginning of the attempt to injure at once, and not a mere act of prepara-
tion for some contemplated injury that may afterwards be inflicted. See
evidence *held* to be insufficient to support a conviction for aggravated
assault, because insufficient to prove an assault.

APPEAL from the County Court of Ellis. Tried below before
the Hon. Q. E. Dunlap, County Judge.

The conviction was for an aggravated assault upon one Fay-
ette Miller, with a gun. The offense was alleged to have been
committed in Ellis county on the fifteenth day of January, 1883.
A fine of fifty dollars was the penalty imposed.

Fayette Miller was the first witness for the State. He testi-
fied, in substance, that some time in January, 1883, he was at
the defendant's gin, in Ellis county, Texas. Mr. M. Halford
came to the gin house, and said to the defendant: "I have come
for one of those bales of cotton and I intend to have it. Right
is right, and right wrongs no man." Halford then went out of
the gin house and began to load the cotton on the wagon. De-
fendant followed, pushed Halford back, threw the cotton off,
and said: "Don't you take that cotton." Halford struck the de-
fendant, and the two fell to the ground, Halford on top. Halford
struck defendant several blows, then got up, walked off a short

distance, picked up a stick, and told defendant that he would drop the stick when defendant put up his knife. Defendant put up his knife and started toward the gin, when Halford said to him: "You have made your brags about marking and splitting ears, but you can't do me that way." Defendant returned and he and Halford engaged in another fight. When the defendant came back this time witness could not say whether Halford was or was not rolling the bale of cotton. Soon after this the defendant's wife came upon the scene of action. She took hold of the lines and attempted to lead the horses away from the bale of cotton, when Halford went around, took hold of the horses, and told Mrs. Fondren not to meddle with the horses. The defendant then went around the wagon and said to Halford: "If you strike my wife I will cut your guts out." Halford thereupon backed off and secured a club about three feet long and two inches in diameter. Defendant then said: "If I cannot protect my property without it, I will go and get my gun." Accordingly he went to the house, about two hundred yards distant, and returned with his gun on his shoulder. When he reached a point about fifty yards distant from the party, he took his gun from his shoulder, and throwing it across his arm said: "Clear the track."

Witness, then being apprehensive of serious trouble, met the defendant and asked him "not to shoot the boy," telling him at the same time that Halford had consented to let the cotton alone. The defendant told the witness to "get out of the way," that "this is not your fight," and walked around witness. The witness followed after him. The witness at this time did not have his knife out. Webb then came out of the gin with a stick and told the witness to hold up; that two on one was too many. Witness then took out his knife and told Webb to stand back, that he, witness, was trying to put a stop to the row. Webb then called to defendant that witness had a knife. Defendant turned, drew his gun on witness, and told witness to put up his knife or he would shoot the witness. Witness put up his knife, and the defendant put up his gun. When witness left Halford to meet the defendant, Mrs. Fondren was standing near and talking to Halford, and she was standing in the same place when witness returned. Several children, including one of the defendant's, were standing around. About this time everything quieted down. Defendant did not frighten the witness when he drew his gun on him.

D

J. J. Daniels was the next witness for the State. His account of the difficulty was the same as that of the witness Fayette Miller, up to the time that the defendant went to the house and returned with his gun. Proceeding with his testimony, he stated that when the defendant got within forty or fifty yards of the crowd he pointed his gun toward the crowd and said: "Look out! I am going to shoot." Miller then walked up to defendant and told him that he should not shoot the boy. Defendant told Miller to go off, that it was none of his fight, and passed around Miller and up to where Halford and Mrs. Fondren were. Webb at this time came up with a club and stopped Miller. Miller drew his knife and told Webb to stand back. Webb replied that two on one was unfair. Miller retorted that he was only trying to stop the row. During this time Webb called to defendant that Miller had a knife. Defendant turned on Miller, covered him with his gun, and told him to put up his knife or he would shoot. Miller put up his knife and defendant put up his gun.

M. L. Halford, the next witness for the State, testified, in substance, that he rented land from his uncle, the defendant, in 1882, and under the contract was to give him one-half of the cotton crop grown on it. Witness had gathered and sold three bales of the cotton. In October or November of that year witness quit the crop, but soon after returned and agreed with defendant to resume work and carry out his contract, and to pick what remained of the cotton before he got any more of it for himself. He had not picked all of the cotton remaining at the time he went for the bale which was the subject matter of this difficulty. There remained, perhaps, some six hundred pounds of unpicked cotton in the field. When the witness went to put this bale in his wagon the defendant pushed the witness off, threw the cotton out of the wagon, and told witness to let the cotton alone. In pushing the witness off he scratched the witness's hand. The two clinched, fell to the ground, the witness on top, and the witness struck defendant several blows. Defendant then drew his knife and attempted to cut witness. Witness got up, walked off and got a stick, and told defendant to put up his knife. The defendant did so, and started back to the gin, when witness said: "You have made your brags about marking and turning loose, but you cannot serve me so." Witness at that time was trying to get the cotton back on the

Opinion of the court.

wagon. Defendant picked up a stick and started back toward the witness, and another little fight ensued.

About this time Mrs. Fondren, the defendant's wife, came up, took hold of the lines, and attempted to lead the horses off. Witness told her to go away; that she was not concerned in that controversy. The defendant stepped up with his knife out and told witness not to strike his wife, unless he wanted to be cut open. Witness stepped off a short distance, picked up a stick, and told defendant to put up his knife. Defendant replied: "If I cannot protect my property any other way I will do it with my gun," and went to the house to get his gun. Witness sat down on a bale of cotton, and Mrs. Fondren came to him and opened up a conversation. The remainder of this witness's statement was essentially the same as that of the witnesses Miller and Daniels.

The statements of two other winesses, one for the State and one for the defense, were substantially the same as those of the foregoing witnesses.

Mrs. Fondren, for the defense, was the last witness to take the stand. She did not see the beginning of the difficulty, and her first appearance upon the scene was when she attempted to lead the horses from the cotton. In preventing her from doing this, Halford caught her by an arm and pressed it so tight that for several days the print of his fingers was on her arm. From this time to the culmination of the affair her account harmonized with that of the others, except that, according to her statement, when Miller went to intercept the defendant, on the latter's return from the house with the gun, he, Miller, drew his knife, held it with the blade up his coat sleeve, and thus armed approached the defendant, and in the same manner followed him back to the crowd. The defendant at no time attempted to shoot Miller.

The motion for new trial raised the question involved in the opinion, and denounced the punishment imposed by the verdict as excessive.

No brief for the appellant has reached the Reporters.

J. H. Burts, Assistant Attorney General, for the State.

Willson, Judge. We are of the opinion that the evidence does not sustain the conviction. Miller was advancing toward

defendant, armed with an open knife, when defendant was told of it, and instantly turned and pointed his gun at him, telling him if he did not put up his knife he would shoot him. Miller put up his knife and the defendant put down his gun. At the time these acts occurred defendant and another person, who was present, were angry at each other, and had just before been engaged in fighting each other, and defendant had gone off and got his gun and returned, with the avowed purpose of protecting his property from being taken by the person with whom he had been fighting. He had had no difficulty with Miller, and there is no evidence that he had any ill feeling or malice toward him. While defendant was in an excited state of mind from his difficulty with the other party, and had his attention directed to that party, he was informed that Miller, who was in his rear, was armed with a knife, and, looking around, he discovered that such was the fact, and that Miller was advancing upon him. With a foe in front and another in the rear, as he doubtless supposed, he very naturally made the necessary preparations to defend himself. He made no attempt to shoot Miller or any one else, but merely stood upon the defensive. It does not appear that his intention was to injure Miller or any one else, unless he was forced to do so in defense of his person or his property. On the contrary, it is shown that when he saw he was no longer in danger he put down his gun and made no further hostile demonstration.

In every assault there must be an intention to injure, coupled with an act which must at least be the beginning of the attempt to injure at once, and not a mere act of preparation for some contemplated injury that may afterwards be inflicted. (Clark's Crim. Law, p. 159, note 70.)

We think the evidence in this case fails to show any act committed by the defendant which, in law, would constitute an assault upon Miller; and because the verdict is not warranted by the proof, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered April 23, 1884.